The **INVESTMENT COMPANY INSTITUTE, Plaintiff,**

v.

**C.T. CONOVER, Comptroller of the Currency; the Office of the Comptroller of the Currency, An Agency of the United States, and the United States of America, Defendants.**

No. C–84–0742–WWS.

United States District Court,
N.D. California.

Aug. 28, 1984.

David J. Romanski, Steinhart & Falconer, San Francisco, Cal., Fried, Frank, Harris, Shriver & Kampelman, Washington, D.C., for plaintiff.

George L. Stoll, Asst. U.S. Atty., San Francisco, Cal., Thomas H. Peebles, U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OF OPINION AND ORDER

SCHWARZER, District Judge.

This action for injunctive and declaratory relief challenges two rulings by defendant Comptroller of the Currency ("the Comptroller") approving proposals by two national banks to establish collective investment funds for individual retirement account ("IRA") trust assets exempt from taxation under the Employee Retirement Income Security Act ("ERISA"), 26 U.S.C. § 408. Plaintiff is a national association of open-end investment companies and their investment advisers and principal underwriters. It claims that the rulings authorize defendants Wells Fargo Bank, N.A. ("Wells Fargo"), and Bank of California, N.A. ("Bankcal"),[1] to create what amount to mutual funds in violation of the prohibition against the marketing of securities by commercial banks in the Glass-Steagall Banking Act of 1933 ("Glass-Steagall"), ch. 89, 48 Stat. 162 (codified as amended in scattered sections of 12 U.S.C.). Defend-ants respond that the approved programs establish not mutual funds but common trust funds which do not violate Glass-Steagall and which are, in any case, expressly authorized by ERISA. Defendants also argue that plaintiff lacks standing to bring this action. There being no disputed factual issues, the parties have filed cross-motions for summary judgment.

FACTS

In 1974, Congress added § 408 to the Internal Revenue Code ("I.R.C.") as part of ERISA to encourage individuals to save income for their retirement. Section 408 authorizes the establishment of IRA's, defined as "trust[s] created or organized ... for the exclusive benefit of an individual or his beneficiaries," to which up to $2000[2] per year may be contributed, I.R.C. § 408(a)(1). Permissible contributions are tax-deductible and earnings on trust assets are not taxed until distributed, id. § 408(d)(1). A tax penalty of 10% is imposed on any distribution of assets in an IRA trust before the settlor reaches the age of 59½, id. 408(f)(1).

Two provisions of § 408 are relevant here. Under § 408(a)(2), only banks and other institutions that receive specific approval of the Secretary of the Treasury may serve as IRA trustees. Section 408(a)(5) prohibits IRA trustees from commingling trust assets "except in a common trust fund or common investment fund."

In 1983, each of the defendant banks decided to establish a Common Trust Fund (collectively "the Funds") under California law for the collective investment of the assets of IRA trusts whose settlors desired such treatment. Pursuant to the Trust Agreements, trust assets are to be invested in several separate investment portfolios, each of which is represented by a separate series of "units of beneficial interest." Each bank acts as trustee and as investment adviser to its Fund and receives

---

1. The complaint named only the Comptroller, his Office, and the United States as defendants. Wells Fargo and Bankcal have moved to intervene as defendants. That motion, apparently unopposed by plaintiff, is hereby granted.

2. A married couple filing jointly one of whom does not work may contribute up to $2,250 per tax year, I.R.C. § 219(a), (c).

monthly fees based in part on the net asset value of the Fund portfolios.

Units in the Funds are available exclusively to IRA trusts established with the banks in compliance with § 408. Investors who open an individual IRA account at the banks may execute a written agreement authorizing investment of IRA trust assets in units of the Funds. The agreement is freely revocable subject to the penalty provisions of § 408, but assets may be transferred from one investment portfolio to another without penalty.

Each bank offers units in its Fund to IRA participants as only one of several IRA alternatives. Investors may choose to have the bank invest their IRA trust assets in the Fund, in certificates of deposit, in the bank's money-market accounts or in self-directed brokerage accounts. IRA trust assets may be transferred among these alternative investments without penalty.

The Securities Exchange Commission ("SEC") has on various occasions expressed the opinion that units of interest in comparable bank funds constitute securities within the meaning of the federal securities laws. Without conceding this characterization, the banks have filed registration statements with the SEC to register their Funds as investment companies under the Investment Company Act ("ICA") and to register the units of beneficial interest as securities under the 1933 Act. The banks claim that the registration merely sought to avoid what they feared might be a costly and time-consuming exemption procedure.

The banks then sought approval of the Funds from the Office of the Comptroller pursuant to its regulations governing the fiduciary powers of national banks, 12 C.F.R. Part 9 (1983). They also sought rulings that the creation of the Funds did not violate §§ 16 and 21 of the Glass-Stea-

gall Act, 12 U.S.C. §§ 24 Seventh and 378(a)(1), which in substance prohibit commercial banks from marketing securities.

On January 27, 1984, the Comptroller issued a formal ruling approving Wells Fargo's Common Trust Fund as consistent with the requirements of 12 C.F.R. Part 9 (except for certain provisions compliance with which was waived under *id.* § 9.18(c)(5)) [3] and with the requirements of Glass-Steagall. He found that the applicant Fund "represents the offering of a bona-fide fiduciary service expressly authorized by Congress in ERISA," WF–AR 1–14. Four days later, he issued a short letter approving Bankcal's Fund on the same grounds.[4]

Plaintiff now challenges the Comptroller's rulings under, *inter alia,* the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.,* arguing that they are contrary to law and thus void. Defendants respond that the rulings comport with Glass-Steagall, that this Court should defer to the Comptroller's construction of federal banking law, and that plaintiff does not have standing to bring this action. Both sides move for summary judgment.

## DISCUSSION

### A. *Standing.*

Defendants argue that plaintiff as a competitor of defendants for the investment of IRA trust assets lacks standing to challenge the Comptroller's rulings because its interests do not fall within the "zone of interests to be protected or regulated by" Glass-Steagall, *see Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). In *Investment Co. Inst. v. Camp,* 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971) (*"Camp"*), however, the Supreme Court rejected precisely this argu-

---

**3.** The Comptroller exempted the Funds, which have supervisory committees of which only a minority is affiliated with the Banks (in accordance with the ICA), from 12 C.F.R. § 9.18(b)(12) requiring exclusive bank management of common trust funds. He also granted an exemption from the requirement in *id.* § 9.18(b)(5)(i) that auditors be responsible only to the bank's board

of directors, permitting the Funds' auditors to be responsible to their supervisory committees.

**4.** In both rulings, the Comptroller relied extensively on the reasoning set forth in his October 21, 1982, decision approving a comparable common trust fund proposed by Citibank, N.A.

ment. There, the same plaintiff challenged a regulation of the Comptroller purporting to authorize banks to act as "managing agents" for collective investment funds. Noting that "Congress did legislate against the competition that the [plaintiffs] challenge," the Court concluded that "[t]here can be no real question ... of [plaintiffs'] standing in light of ... *Data Processing,*" *id.* at 620–21, 91 S.Ct. at 1093–94.

■ Defendants cite Justice Harlan's dissent in *Camp* and then-Circuit Judge Burger's concurrence in the court below, both of which concluded that plaintiff had no standing because Glass-Steagall did not seek to protect bank competitors. It is a sufficient response to note that the *Camp* majority rejected these arguments. Moreover, the "zone of protected interests" test established by *Data Processing* on which *Camp* relied has recently been affirmed by the Court, *see Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982). *Camp*'s holding that plaintiff can meet both the constitutional and prudential requirements of the standing doctrine under Glass-Steagall is thus controlling.

### B. *Standard of Review.*

■ Defendants correctly argue that this Court must substantially defer to the Comptroller's construction of the federal banking statute with regard to national banking activities within his regulatory jurisdiction, *see Securities Ind. Ass'n v. Board of Governors,* — U.S. —, 104 S.Ct. 3003, 3009, 82 L.Ed.2d 158 (1984) (*"Schwab"*). However, in a companion case to *Schwab,* the Supreme Court cautioned that

> deference is not to be a device that emasculates the significance of judicial review. Judicial deference to an agency's interpretation of a statute "only sets 'the framework for judicial analysis; it does

not displace it.' " *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 24 [102 S.Ct. 821, 827, 70 L.Ed.2d 792] (1982), *quoting United States v. Cartwright,* 411 U.S. 546, 550 [93 S.Ct. 1713, 1716, 36 L.Ed.2d 528] (1973). A reviewing court "must reject administrative constructions of [a] statute, whether reached by adjudication or by rulemaking, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 32 [102 S.Ct. 38, 42, 70 L.Ed.2d 23] (1981).

*Securities Ind. Ass'n v. Board of Governors,* — U.S. —, 104 S.Ct. 2979, 2983, 82 L.Ed.2d 107 (1984) (*"Becker"*). *Becker* also noted that judicial review should be less deferential to *post hoc* rationalizations of an agency's decisions not articulated at the administrative level, *id.* 104 S.Ct. at 2983–84. The Comptroller's arguments in support of his motion for summary judgment here, at least with regard to the legality of the Funds under the Glass-Steagall Act, are virtually identical to those on which he expressly based the two rulings challenged by plaintiff. Accordingly, the Comptroller's interpretation of Glass-Steagall should be overturned only if the Court finds that it conflicts with or otherwise frustrates the policies that the statute seeks to implement.

### C. *The Glass-Steagall Act.*

The Glass-Steagall Act, one of a complex of statutes enacted in response to the national financial crisis of the 1930's, sought to prohibit what Congress considered to be the dangerous entanglement of commercial banks in investment-banking activities. Sections 16 and 21 of the Act, which the Supreme Court has consistently found to "draw the same line," *Becker,* 104 S.Ct. at 2986, prohibit commercial banks from "issuing, underwriting, selling, or distributing ... securities."[5]

---

5. Section 16 provides that the "business of dealing in securities and stock [by a national bank] shall be limited to purchasing and selling such securities and stock without recourse, solely

upon the order, and for the account of, customers, and in no case for its own account...." It also provides that a national bank "shall not underwrite any issue of securities or stock."

In *Camp, supra,* the Supreme Court explained in some detail the limitations imposed by the Glass-Steagall Act on the types of financial services commercial banks can offer. There, the Comptroller had issued regulations permitting national banks to collectively invest assets received by the bank in trust "[i]n a common trust fund, maintained by the bank exclusively for the collective investment ... of monies contributed thereto by the bank in its capacity as managing agent," 12 C.F.R. § 9.18(a) (1963). Pursuant to that regulation, the Comptroller approved a commercial bank's plan for the collective investment of managing agency funds not held by the bank in trust. 401 U.S. at 622 & nn. 7–8, 91 S.Ct. at 1094 & nn. 7–8. Plaintiff challenged the legality of the plan under Glass-Steagall.

The Supreme Court invalidated the Comptroller's ruling. It began with the observation that the commingling of trust assets by national banks in common trust funds was undoubtedly "consistent with the banking laws" and had been "expressly authorized by the Federal Reserve Board by Regulation F promulgated in 1937," *id.* at 624, 91 S.Ct. at 1095. It also recognized that national banks could act as managing agents and purchase stock for the account of its customers, *id.* at 625, 91 S.Ct. at 1096.

> But the union of these powers gives birth to an investment fund whose activities are of a different character. The differences between the investment fund that the Comptroller has authorized and a conventional open-end mutual fund are subtle at best, and it is undisputed that this bank investment fund finds itself in direct competition with the mutual fund industry. One would suppose that the business of a mutual fund consists of buying stock "for its own account" and of "issuing" and "selling" "stock" or "other securities" evidencing an undivid-

ed and redeemable interest in the assets of the fund. On their face, §§ 16 and 21 of the Glass-Steagall Act appear clearly to prohibit this activity by national banks.

*Id.* (footnotes omitted).

The Court buttressed its conclusion by underlining the congressional considerations that animate the Glass-Steagall Act. It noted Congress's fear that speculation by banks in the inherently risky securities market could diminish the confidence of commercial depositors. The Court also explored legislative concern with the potential conflicts of interest bound to arise when a commercial bank engages in investment-banking activity. A bank's desire to find new investors to purchase redeemed interests in competition with mutual funds and to support companies whose securities it purchased could generate promotional pressures, affect the bank's loan decisions and investment advice, and generally compromise its traditional roles as fiduciary and depository.

> In sum, Congress acted to keep commercial banks out of the investment banking business largely because it believed that the promotional incentives of investment banking and the investment banker's pecuniary stake in the success of particular investment opportunities was destructive of prudent and disinterested commercial banking and of public confidence in the commercial banking system. As Senator Bulkley put it:
>
>> "If we want banking service to be strictly banking service, without the expectation of additional profits in selling something to customers, we must keep the banks out of the investment security business."

*Id.* at 634, 91 S.Ct. at 1100 (footnote omitted).

*Camp* emphasized, however, that although the Glass-Steagall Act prohibited "a

---

Section 21 provides that "it shall be unlawful—(1) For any person, firm, corporation, association, business trust, or other similar organization, engaged in the business of issuing, underwriting, selling, or distributing, at wholesale or retail, or through syndicate participation, stocks, bonds, debentures, notes, or other securities, to engage at the same time to any extent whatever in the business of [deposit banking]."

bank's entry into the mutual investment business," *id.* at 639, 91 S.Ct. at 1103, the hazards. Congress feared are not present

when a bank undertakes to purchase stock for the account of its individual customers or to commingle assets which it has received for a true fiduciary purpose rather than for investment. These activities, unlike the operation of an investment fund, do not give rise to a promotional or salesman's stake in a particular investment; they do not involve an enterprise in direct competition with aggressively promoted funds offered by other investment companies; they do not entail a threat to public confidence in the bank itself; and they do not impair the bank's ability to give disinterested service as a fiduciary or managing agent. In short, there is a plain difference between the sale of fiduciary services and the sale of investments.

*Id.* at 638, 91 S.Ct. at 1102 (footnote omitted).

Reiterating the concerns relied on in *Camp, Becker,* decided by the Court just last Term, concluded that the securities which Glass-Steagall prohibits commercial banks from issuing include commercial paper. The Court looked to the plain meaning of "securities" as evidenced by the definition of the term in the contemporaneously enacted securities acts [6] and to the Glass-Steagall Act's flat prohibition of the issuance of "notes and other securities" regardless of whether "the note is properly viewed as an 'investment,'" 104 S.Ct. at 2988.

Moreover, the Court in *Becker* worried that a bank's entry into the commercial-paper market might create a "salesman's interest" in particular offerings inconsistent with the bank's roles as lender, depository and investment adviser. It noted that banks might "enhance the marketability of an issue by extending back-up credit to the issuer," "purchase unsold notes in order to demonstrate the reliability of [their] distri-

bution system[s]," or "use their relationships with depositors to facilitate the distribution of securities in which the bank has an interest," *id.* 104 S.Ct. at 2989–90. The Court further suggested that

[b]y giving banks a pecuniary incentive in the marketing of a particular security, commercial-bank dealing in commercial paper also seems to produce precisely the conflict of interest that Congress feared would impair a commercial bank's ability to act as a source of disinterested financial advice.

*Id.* 104 S.Ct. at 2990. In sum, it found all of the concerns behind the Glass-Steagall Act implicated by the banks' effort to "put[ ] [themselves] in competition with [securities dealers], *id.* at 2989, citing *Camp,* 401 U.S. at 637, 91 S.Ct. at 1102.

Relying on *Camp* and on the appellate decision in *A.G. Becker, Inc. v. Board of Governors,* 693 F.2d 136 (D.C.Cir.1982), which the Supreme Court subsequently reversed in *Becker,* the Comptroller reasoned that interests in the Funds at issue here were not "securities" within the meaning of the Glass-Steagall Act, although they might be for purposes of the securities laws, because of their "bona fide fiduciary purpose." He also determined that the state trust law, federal regulations and provisions of ERISA to which the Funds are subject would avert the hazards Congress sought to prevent by the Glass-Steagall Act. Plaintiff claims both conclusions are incorrect.

1. *"Securities" and Bona Fide Fiduciary Purpose.*

Plaintiff asserts first that, under *Becker,* the term "securities" in the Glass-Steagall Act must be interpreted according to its plain meaning. Moreover, plaintiff argues, *Becker* held that securities for purposes of the federal securities laws are also securities under Glass-Steagall. Inasmuch as interests in the Fund challenged here are plainly securities within the common mean-

---

**6.** The Securities Act of 1933, for example, includes commercial paper as one of the securities exempted from its registration provisions, 15 U.S.C. § 77c(a)(3), but covered by its antifraud provisions, *id.* §§ 77*l,* 77q(c). *See Becker,* 104 S.Ct. at 2987 & n. 7.

ing of the term and, according to the SEC, within the meaning of the Securities Act of 1933, plaintiff reasons, they must be found to violate Glass-Steagall.

The issue, however, is not so simple, in part because of the regulatory and judicial treatment accorded common trust funds over the past fifty years. As *Camp* noted, banks have been expressly empowered to create common trust funds since the Federal Reserve Board adopted section 17 of Regulation F in 1937 pursuant to its authority under repealed 12 U.S.C. § 248(a). In 1962, Congress transferred authority over bank trusts to the Comptroller, 12 U.S.C. § 92a, who adopted 12 C.F.R. § 9.18 to regulate common trust funds. The jurisdictional transfer, however, did not "modify[ ] any provision of substantive law," *Camp*, 401 U.S. at 621–22, 91 S.Ct. at 1094.

Although *Camp* made clear that the commingling of trust assets does not violate the Glass-Steagall Act as long as they are "received for a true fiduciary purpose rather than for investment," *id.* at 638, 91 S.Ct. at 1102, it is equally clear that "securities" is defined broadly enough in the 1933 and 1934 Securities Acts to encompass interests in common trust funds, *see* 15 U.S.C. § 77b(1). In fact, the 1933 Act, 15 U.S.C. § 77c(a)(2), was amended in 1970 to add interests in bank common trust funds to the "classes of securities" exempted from its registration provisions[7] though not from its fraud provisions.[8] *See also* 15 U.S.C. § 80a–3(c)(3) (exempting common trust funds from ICA regulations). That interests in the investment funds at issue here may be securities under the securities laws, therefore, does not compel the conclusion that they are securities within the meaning of the Glass-Steagall prohibition;[9] if it did, *all* common trust funds would violate the Act, a conclusion that *Camp* precludes.[10]

The proper inquiry under *Camp* is whether the assets commingled in defendant banks' Funds are "received for a true fiduciary purpose rather than for investment," 401 U.S. at 638, 91 S.Ct. at 1102. The Comptroller based his finding of a bona fide fiduciary purpose on several factors. He pointed out that ERISA sets strict limits on the amount of funds IRA participants can invest each year and that, although the trust agreements are nominally revocable, the 10% tax penalty imposed by § 408(f)(1) effectively precludes early distributions and ensures their use for retirement savings. Moreover, units in the Fund are not transferable to other individuals and cannot serve as security for a loan. Finally, only individuals eligible under § 408 may invest in the Funds which are marketed only as part of "an overall IRA program." Mutual funds prohibited by the Glass-Steagall Act, defendants contend, share none of these characteristics.

The Comptroller also reasoned that the bona fide fiduciary character of the Funds is established by the complex regulations to

---

**7.** Until 1970, the SEC "generally believed that operation of a common trust fund would fall within section 4(2) of the Securities Act of 1933, [15 U.S.C.] § 77d(2), for offerings not involving a public offering." Lybecker, Bank-Sponsored Investment Management Services: Consideration of the Regulatory Problems, and Suggested Legislative and Statutory Interpretive Responses, 1977 Duke L.J. 983, 993 n. 41.

**8.** *Becker* made clear that the term "securities" in the Glass-Steagall Act may include securities exempted in § 3(a) of the 1933 Act. *See* text at note 6, *supra.*

**9.** Contrary to plaintiff's assertion, *Becker* did not hold that the definitions of "security" in the 1933 Act and Glass-Steagall are coterminous. It merely characterized the 1933 Act definition as evidence of congressional intent in the Glass-Steagall Act.

**10.** Defendants point to the fact that corporate and Keogh employee benefit plan trusts qualified under I.R.C. § 401 and commingled in a bank common trust are expressly exempted from the registration and regulatory requirements of the 1933 Act and the ICA, 15 U.S.C. §§ 77c(a)(2), 80a–3(c)(3). IRA common trust funds, however, are not so exempted. Moreover, exemption under § 3(a)(2) does not necessarily imply exclusion from Glass-Steagall, see footnote 8 supra. Finally, it is not clear and the Court need not decide whether all corporate and Keogh common trust funds are permitted under Glass-Steagall regardless of how marketed.

which bank common trust funds are subject under state and federal law. California imposes strict fiduciary obligations upon trustees, *see* Cal.Civ.Code § 2228–2239, requiring for example that they "act in the highest good faith toward [their] beneficiar[ies]," *id.* § 2228, and prohibiting self-dealing, *id.* §§ 2230–2233. Similarly, 12 U.S.C. § 92a and the Comptroller's regulations in 12 C.F.R. Part 9 govern the administration of fiduciary powers, *id.* § 9.7, audits, *id.* § 9.9, self-dealing, § 9.12, and compensation, § 9.15. Moreover, § 9.18 provides for more rigorous regulation of common trust funds. Finally, § 408 itself imposes additional restrictions on IRA trustees, *see, e.g.,* § 408(a)(3).

■ It is clear, however, that under *Camp* the validity of an investment fund under the Glass-Steagall Act does not hinge on its trust form *vel non.* Although the fund held illegal there was not a trust but a managing agency account, the Court expressly noted that in enacting Glass-Steagall Congress was concerned with investment trusts:

> The Glass-Steagall Act was the product of hearings conducted pursuant to Senate Resolution 71 which included among the topics to be investigated the impact on the banking system of the formation of investment and security trusts. The subcommittee found that one of the activities in which bank security affiliates engaged was that of an investment trust: "buying and selling securities acquired purely for investment or speculative purposes." Since Congress generally intended to divorce commercial banking from the kinds of activities in which bank security affiliates engaged, there is reason to believe that Congress explicitly intended to prohibit a national bank from operating an investment trust.

401 U.S. at 635, 91 S.Ct. at 1101 (footnotes omitted).

Even a fund governed by state and federal trust law would violate the Act if not limited to fiduciary purposes.

■ Regulation by the Comptroller, moreover, does not suffice to relax Glass-Steagall concerns. Confronted with a similar argument, *Becker* reviewed the legislative history and concluded that "Congress rejected a regulatory approach when it drafted the statute, and it has adhered to that rejection ever since," *Becker,* 104 S.Ct. at 2988. The Glass-Steagall Act relies not on administrative regulation but rather on flat prohibition to "separate as completely as possible commercial from investment banking," *Board of Governors v. ICI,* 450 U.S. 46, 70, 101 S.Ct. 973, 989, 67 L.Ed.2d 36 (1981).

■ Most significantly, the regulations on which the Comptroller relies provide that "a national bank administering a collective investment fund shall have the exclusive management thereof," 12 C.F.R. § 9.18(b)(12). Here, the Comptroller exempted the Funds from § 9.18(b)(12) in order to permit them to qualify for registration under the ICA which requires that a majority of their board of directors not be affiliated with any one bank, 15 U.S.C. § 80a–10(c), *see* footnote 3 *supra.* The Comptroller found that the delegation of Fund management to a "supervisory committee" would not detract from the Banks' "responsibility for day-to-day activities of the Trust[ ]" and that the banks could "generally be held fully accountable for actions taken in contravention of [their] fiduciary responsibilities." The clear purpose of § 9.18(b)(12), however, is to ensure that banks retain *exclusive* fiduciary responsibility for their common trusts. They cannot meet that responsibility when, as the Comptroller found here, they delegate "ultimate control" over Fund affairs to outsiders. Thus the Fund's exemption from § 9.18(b)(12) renders the Comptroller's conclusion insupportable.

Additional evidence of the investment, as opposed to fiduciary, character of the funds is offered by 26 Fed.Res.Bull. 393 (1943), cited with approval by *Camp,* 401 U.S. at 621, 638 & n. 37, 91 S.Ct. at 1094, 1102 & n. 37. In explaining § 17 of its Regulation F, the Board noted that

[w]hile the operation of a Common Trust Fund might ... enable a trust institution to accept small trusts which it otherwise would be unwilling to handle, it was contemplated that trust guise or form should not be used to enable a trust institution to operate a Common Trust Fund as an investment trust attracting money seeking investment alone and to embark upon what would be in effect the sale of participations in a Common Trust Fund to the public as investments.

As an example, the Board cited its prior ruling that solicitation of the public to create uniform revocable trusts designed specifically to participate in a common trust fund would not conform with the regulation.

Similarly, 42 Fed.Res.Bull. 228 (1956), also cited by *Camp*, explains that

the tone of common trust fund advertising should in every manner be appropriate to the collective uses and advantages of such funds without seeking to popularize any particular use or advantage. However, advertising which fails to make clear that a common trust fund is solely a facility for the investment of funds held for true fiduciary purposes or advertising which overemphasizes the advantages of such funds for investment or estate building purposes would be inconsistent with the applicable restrictions on publicity of such funds.

The emphasis in *Camp* and in the Reserve bulletins cited above on the manner in which funds are established and promoted to the investing public is underlined by recent SEC interpretation of the exemption in § 3(a)(2) of the 1933 Act and of § 3(c)(3) of the ICA for common trust funds. As has been noted, securities exempted under § 3(a)(2) are not thereby excluded from the Glass-Steagall Act, *see* footnote 8 *supra*. The SEC has consistently interpreted the (3)(a)(2) and (3)(c)(3) exemptions for common trust funds as coextensive with the criteria of *Camp* and § 17 of old Regulation F, however, by relying on legislative history that the exemptions are limited to "funds maintained by a bank for the collective investment of assets held by it in a bona fide fiduciary capacity and incident to a bank's traditional trust department activities," H.R. No. 1382, 91st Cong., 2d Sess. 43 (1970) *cited in United Missouri Bank of Kansas City, N.A.*, SEC No-Action Letter (Dec. 1, 1981). Numerous SEC no-action letters cited by plaintiff suggest that exemption is not available for common trust funds "promoted or merchandised as a pooled investment vehicle," *First Pennsylvania Bank*, SEC No-Action Letter (Dec. 3, 1977). Moreover, with regard to an IRA common trust fund under § 408, the agency has held exemption unlikely if "interests in it are offered, directly or indirectly, through, for example, the use of standardized revocable trusts to the public as investments," *Continental Bank*, SEC No-Action Letter (August 3, 1982). Exemption would be appropriate, on the other hand, where the "participating IRA trusts in the Common Fund pre-existed the Common Fund and do not appear to have been created as a means of investing in any fund," *id.*

Measured against this standard, the Funds offered by defendant banks do not meet the bona fide fiduciary requirement set forth in *Camp*. Wells Fargo and Bankcal each promote their Funds as vehicles for pooled investment. Rather than commingle the assets of pre-existing[11] trust accounts, they seek to attract investors by promoting the advantages of particular investment portfolios in direct competition with mutual funds. Both banks offer standardized, revocable trust agreements. Wells Fargo's marketing brochure, moreover, informs potential customers that they can "invest all or part of their IRA funds in

---

**11.** Plaintiff correctly defines "pre-existing" in this context to include trusts "both on the books now or to come on the books in the natural course of business." The Glass-Steagall Act does not forbid the commingling of trust assets in a common trust fund previously created. Instead, it prohibits the solicitation of trust funds for investment rather than bona fide fiduciary purposes. Defendants' argument that establishment of the common trust fund only after formation of the individual trusts would be overly burdensome is thus misdirected.

the stock market through two innovative investment funds." It goes on to say:

> These funds are highly liquid—you can "cash in" by transferring to another Wells Fargo IRA option at any time. Each fund requires a minimum $250 investment—less than most mutual funds. These are no-load funds.

The brochure then describes the various portfolios labelled "Corporate Stock Fund" and "Small Companies Stock Fund" and concludes by warning that "as with any investment fund, your deposits are not insured against loss in event of a market decline." Bankcal's literature is similar.

That eligible IRA participants, of whom it is conceded there are in excess of 100,000,000, cannot invest more than $2000 per year does not detract from the investment character of the Funds. Moreover, although the 10% penalty makes clearly distributions unlikely, invested funds can be "rolled over" into other, more secure IRA accounts such as certificates of deposit and are thus, in a sense, as liquid as if there were no penalty. Finally, the retirement purpose of IRA accounts is not inconsistent with the investment, as opposed to the fiduciary, character of the Funds: long-term investments are a common means of providing post-retirement income.

### 2. *Glass-Steagall Hazards.*

In determining that the Funds do not violate the Glass-Steagall Act, the Comptroller also relied on his conclusion that they do not implicate the hazards which the Act seeks to avert. He found that the reputation of the Banks would not suffer given "the absence of any current adverse effects on the reputation of banks arising from their significant involvement in the collective investment of pension fund assets." He also doubted that the Funds would affect the Banks' loan decisions because "in the case of a highly diversified fund, it seems implausible that the Bank would be tempted to lend to any issuer whose securities are held by the fund merely to support the fund." Similarly "implausible" to the Comptroller was the possibility that the Funds might compromise the objectivity of the Banks' investment advice or that "high-volume unit redemption would occur." Finally, the Comptroller noted that these hazards are equally likely whenever a bank engages in traditional fiduciary activities.

It appears, however, that the Comptroller's somewhat conclusory findings simply disagree with congressional determinations, enumerated in *Camp* and *Becker,* regarding the potential dangers of commercial bank entry into the field of investment banking. The objectivity of banks' loan decisions and of their investment advice is no less likely to be affected by their promotional interest in funds of the kind challenged here than it would be by the managing accounts held illegal in *Camp,* regardless of the degree of the diversity of investments in the fund at issue there. As in *Camp,* because it is not "a matter of indifference to the bank whether the customer buys an interest in the bank's fund or makes some other investment," 401 U.S. at 636, 91 S.Ct. at 1101, the banks here may well be tempted to advise customers to purchase shares in the Funds for reasons other than the comparative merit of available investments. And even if high-volume redemption is unlikely, the possibility of "roll over" may exert pressures on the Banks to sell additional units comparable to those in *Camp.*

Moreover, although traditional fiduciary and investment services of banks might give rise to similar abuses, *Camp* makes clear that it is the manner in which such services are offered and marketed that invokes Glass-Steagall concerns. Promoted as pooled investment vehicles designed to compete with mutual funds, the Funds at issue here could tend to create a greater "salesman's stake" than do traditional common trust funds. This is especially so where, as here, the Banks receive a fee directly proportional to the net asset value of the funds' portfolios. In sum, defendant Banks' establishment and promotion of Funds as investments in competition with mutual funds could generate precisely the

hazards feared by Congress in enacting Glass-Steagall.

## D. *ERISA*

 Defendants also argue that even if the Funds would otherwise violate Glass-Steagall, they are expressly authorized by ERISA whose subsequently enacted, more specific provisions should control.[12] The argument is without merit.

To begin with § 408, on which defendants rely, provides that IRA trustees must be banks or other persons approved by the Secretary of the Treasury and that trust assets "will not be commingled with other property except in a common trust fund or common investment fund." The statutory language simply authorizes banks to place IRA assets in collective investment funds in accordance with their traditional fiduciary duties. Nothing in § 408 purports to permit banks to market interests in funds created as an investment vehicle.

Moreover, the legislative history cited by both parties evidences Congress's intent to permit IRA trust assets to be invested in mutual funds but to be commingled only in common trust funds such as those traditionally established by banks for purposes of diversifying investments. The House Report on § 408, for example, stated:

> The balance in an individual retirement account generally may be invested in any assets that are acceptable investments for a qualified plan. The account balance could, for example, be invested in insurance annuity contracts, in a savings account with a savings and loan institution or a credit union, or in stock of a mutual fund. However, account assets generally are not to be commingled with other property except in a common trust fund.

H.R.Rep. No. 93–807, 93d Cong., 2d Sess. (1974), *reprinted in* [1974] U.S.Code Cong. & Admin.News 4639, 4797. Similarly, the House Conference Report stated:

> the assets of an individual retirement account may not be commingled with other property, except in a common trust fund or investment fund (i.e., a group trust), solely for the purposes of diversifying investments ....

H.Conf.Rep. No. 93–1280, 93d Cong., 2d Sess. (1974), *reprinted in* [1974] U.S.Code Cong. & Admin.News 5117. The passages cited clearly indicate that Congress meant for the traditional distinction between mutual funds and common trust funds to survive.

Defendants argue that in enacting § 408, Congress had before it the example of qualified corporate and Keogh employee benefit plan trusts which, they contend, are marketed to the public in precisely the same way as the Funds at issue here. They point to nothing in the legislative history, however, indicating express or implicit approval of bank promotion of employee benefit trusts in a manner violative of the Glass-Steagall Act. Nor do defendants cite evidence that Congress considered SEC registration of interests in certain employee benefit plan trusts or, for that matter, in IRA trusts sufficient to eliminate Glass-Steagall concerns. Moreover, as plaintiff contends, no court or federal banking agency has evaluated the legality of particular employee benefit plan trusts in light of *Camp*, and their generic legality is not at issue in this action.

Furthermore, nothing in ERISA's legislative history suggests an intent to override

---

**12.** Significantly, the Comptroller's rulings did not rest on this ground. They noted merely that ERISA authorizes banks to commingle IRA trust assets in common trust funds, a contention plaintiff does not dispute. They also cited to the Comptroller's earlier ruling with regard to Citibank, see footnote 4 supra, which framed the issue as follows:

> Having determined that collectively investing the assets of IRA trusts is a permissible trust service sanctioned by statute and the Constitution's requirements, it is necessary to determine whether [the Glass-Steagall Act] imposes any impediment to a bank offering these fiduciary services.

The Court need not defer to statutory construction now offered for the first time by defendants' counsel. See *Becker,* 104 S.Ct. at 2983 (*"post hoc* rationalizations by counsel for agency action are entitled to little deference").

the prohibitions of the Glass-Steagall Act. The House Conference Report expressly noted that "this legislation ... is not to limit in any way the application of the Federal securities laws to [IRAs] *or the application to them of the laws relating to common trusts or investment funds maintained by any institution.*" *Id.* (emphasis added).

■ Finally, defendants argue that invalidation of the Funds will defeat the intent of ERISA to make bank collective investment as widely available as possible to millions of eligible IRA participants. But plaintiff does not argue, and the Court does not hold, that banks cannot establish common trust funds for IRA trust assets or cannot publicize their existence to potential IRA participants. Rather, they are precluded from marketing participations in the Funds as securities in competition with mutual funds.[13] ERISA's goals are not hampered by Glass-Steagall's prohibitions any more than are those of 12 U.S.C. § 92a authorizing banks to establish trusts and act as trustees.

### E. *Conclusion.*

The governing standards for determining whether a common trust fund is promoted for fiduciary or investment purposes were set forth in 41 Fed.Res.Bull. 142 (1955), cited by *Camp:*

> The unsolicited furnishing of information to the general public, or to selected portions of the public, should be confined to acquainting the reader with the existence of the common trust fund and the purpose and use of such fund. It is wholly appropriate, therefore, to publicize the fact that a common trust fund has been established or is maintained by a bank as well as to make known its special and restricted purposes and uses. However,

the common trust fund is not to be regarded as an investment entity to be popularized in and of itself. Publicity efforts of a trust institution operating a common trust fund should be directed toward demonstrating the desirability of and need for corporate fiduciary services. Reference to the common trust fund in such publicity should be incidental to the provision of such services and should be discussed only as one medium possibly to facilitate the investment of funds held for true fiduciary purposes. Furthermore, trusts created and used for bona fide fiduciary purposes are to be distinguished from trusts created by individuals primarily seeking the benefits to be derived from corporate fiduciary investment management.

Defendant banks' Funds as now established and promoted clearly fall on the investment side of the distinction, especially in light of their exemption from the Comptroller's own fiduciary regulations, and they therefore run afoul of the Glass-Steagall Act. The Comptroller's rulings must be set aside. Accordingly, plaintiff's motion for summary judgment is granted and defendants' motion denied.

IT IS SO ORDERED.

---

13. Defendants cite *Franklin Nat. Bank v. New York,* 347 U.S. 373, 378, 74 S.Ct. 550, 553, 98 L.Ed. 767 (1954), for the proposition that a bank may lawfully advertise any service it offers. That case upheld a national bank's use to advertise federally-authorized savings deposits of the word "savings" in violation of state legislation. *Camp* held, however, that one factor in determining whether a bank's investment fund violates the Glass-Steagall Act is the manner in which it is promoted. The legality of defendant banks' advertising is thus not in question. Rather, the manner in which they market their Funds bears on their "bona fide fiduciary purpose."