WISCONSIN REAL ESTATE INVESTMENT TRUST, Plaintiff-Appellant,

v.

George WEINSTEIN, et al., Defendants-Appellees.

No. 85–1541.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 3, 1985.

Decided Jan. 13, 1986.

Richard C. Ninneman, Whyte & Hirsch-
boeck, Milwaukee, Wis., for plaintiff-appel-
lant.

Irvin B. Charne, Charne, Glassner, Te-
han, Clancy & Tatelman, Milwaukee, Wis.,
for defendants-appellees.

Before EASTERBROOK, Circuit Judge,
ESCHBACH, Senior Circuit Judge, and
GRANT, Senior District Judge.*

EASTERBROOK, Circuit Judge.

A real estate investment trust is super-
vised by a board of trustees but run from
day to day by independent contractors that
evaluate, buy, sell, and manage property.
In 1975 Wisconsin Real Estate Investment
Trust (WREIT) hired REIT Property Man-
agers, Ltd. (RPM) to conduct the trust's
daily business. The officers of RPM were
George Weinstein and his son Stanley, who
also were partners in Weinstein Associates.
RPM contracted with Weinstein Associates
for the services RPM would supply to
WREIT. This structure was approved by
WREIT's trustees. In April 1977 George
Weinstein became a trustee of WREIT and
was elected its president. Stanley Wein-
stein never became an officer of WREIT.

I

In 1980 the trustees of WREIT were
turned out after a proxy contest. WREIT
promptly sued the Weinsteins and their
firms, charging that they had violated the
declaration of trust, the fiduciary principle
of the common law, and the federal securi-
ties laws. The claims based on Wisconsin
law are supported by pendent jurisdiction.
After a trial the district court entered judg-
ment for the defendants. 530 F.Supp. 1249
(E.D.Wisc.1982). See also 509 F.Supp. 1289

* The Honorable Robert A. Grant, Senior District
Judge for the Northern District of Indiana, is
sitting by designation.

(E.D.Wisc.1981), 489 F.Supp. 250 (E.D. Wisc.1980). Another panel of this court reversed one aspect of this decision, concluding that WREIT had not complied with § 4.5 of its declaration of trust. 712 F.2d 1095 (7th Cir.1983).

WREIT and its Manager (as we shall call the Weinsteins, RPM, and Weinstein Associates, even though the label is not strictly accurate) had a complex arrangement for compensation. The Trust paid the Manager a fixed compensation that was negotiated every year. This ranged from a low of $66,800 in calendar year 1975 to a high of $294,996 in 1979. These sums are payments for all services; we distinguish later between the payments attributable to the management of property and those attributable to advice about investments. The Manager received bonuses based on WREIT's income and earnings as well as the cost of living. The trustees also approved extra compensation to the Manager in the form of commissions on particular purchases or sales of property that the trustees thought particularly advantageous to the trust or difficult to arrange. These commissions were approved one transaction at a time.

The Manager in turn paid WREIT substantial sums every year. These payments (called "credits" in this litigation) came from several sources. Some were fees the manager made by holding property in a way that created tax benefits. The profits from the benefits could be shared among the Manager, WREIT, and those who bought property (or beneficial interests in property) from WREIT. The credits also had some other sources, including covenants not to compete and management of property held by the trust for the benefit of third parties. As its contract required, the Manager paid these credits to WREIT. The parties offset the payments, bonuses, and commissions from WREIT against the credits from the Manager. In 1978 the Manager paid WREIT a net of $72,030 after all offsets; in 1979 WREIT paid the Manager a net of $175,317; the other nets are in between. The Manager's total compensation (that is, the sums it kept) was roughly $257,000 in 1977, $302,000 in 1978, and $420,000 in 1979.

This arrangement created problems under § 4.5, which provides that when the Manager "shall receive any commission or other remuneration in connection with the purchase or sale by the Trust of any of its investment assets ... the amount of such commission or other remuneration shall be deducted from and credited against the compensation payable to the Manager for its services in such capacity." WREIT paid the Manager commissions. Before doing so, WREIT obtained an opinion of counsel that it did not need to make corresponding reductions in the Manager's basic compensation. According to counsel, § 4.5 was designed to penalize the Manager for secret commissions and kickbacks from third parties who dealt with the trust; counsel thought that § 4.5 was inapplicable to disclosed dealings with the trust itself because corresponding changes could be made in the Manager's salary. The district court agreed, but this court did not. We found § 4.5 a "clear, direct, specific, unambiguous and mandatory" (712 F.2d at 1101) requirement to reduce the Manager's compensation as advisor (*id.* at 1097 n. 6) one dollar for every dollar of commission. The panel returned the case to the district court for the necessary computations.

From July 1977 through 1980 the Manager received commissions of $158,592 in cash and 27,000 shares of WREIT stock issued in lieu of $91,000 of additional commissions. Some of the commissions were to be paid by third parties as co-brokerage. WREIT's new trustees induced the third parties to withhold $30,000 of commissions, and WREIT has withheld dividends on the stock. Because the Manager received more than the total commissions in regular compensation as adviser during 1977–80, WREIT urged the district court to order the Manager to return the entire $158,592 plus interest and to surrender the 27,000 shares, which have appreciated.

The district court saw things differently. The court required the Manager to pay

$56,057 plus interest and allowed the Manager to keep the stock. The court also ordered WREIT to pay the withheld $30,000 plus interest and to reimburse the defendants for their attorneys' fees and costs, which exceed $220,000. So although WREIT won the case, the court required net payments of about $194,000 in favor of the defendants.

The first step in the district court's treatment was a division of the payments into years. The court determined the Manager's advisory income in each year, defining "year" as the months covered by a contract rather than a calendar or fiscal year. The 1977 and 1978 contracts ran July through June; the 1979 contract ran July 1979 through December 1979; the 1980 contract was for a calendar year but was cancelled by the new trustees in mid-June. Then the district court apportioned the compensation in 1977 and 1978 between advice and management in the same ratio (31.8%) as the contracts themselves established (on average) for 1979 to 1980. Advisory compensation included both a percentage of the regular fees and a percentage of the bonuses.

From the advisory compensation for each year, the district court subtracted the credits for fees the Manager had paid to WREIT. This established a net compensation to the Manager, which should have been reduced under § 4.5 by the amount of any commissions. The court counted as commissions both the cash and the $91,000 value of the stock, which it attributed to 1980. The stock would be treated as cash, the court held, and need not be returned. The commissions were matched to the contract years, producing these results:

| | 1977 | 1978 | 1979 | 1980 |
|---|---|---|---|---|
| Advisory Compensation | $73,514 | $86,905 | $57,864 | $46,667 |
| Fee Credits | 329,500 | 108,960 | 32,960 | 15,514 |
| Net Advisory Compensation | 0 | 0 | 24,904 | 31,153 |
| Commissions | 63,625 | 42,500 | 30,000 | 113,467 |

The credits for 1977 and 1978 meant that the Manager received no net advisory compensation, so it was unnecessary to return any of these years' commissions. The commissions in contract years 1979 and 1980 exceeded the net advisory compensation, so the court required the Manager to return the net compensation, a total of $56,057. The court added simple interest.

The court held that only George Weinstein would be required to pay. This followed, the court thought, from our opinion in 1983, which had considered and rejected George Weinstein's defense that as a trustee he had relied in good faith on the advice of counsel in creating this structure for the payments. Construing § 3.1 of the declaration of trust, the earlier panel held that a trustee's power to decide was limited by specific rules such as § 4.5 (see 712 F.2d at 1100–01). The district court observed that its initial decision had held for all defendants. The only basis of liability under § 4.5 would be the *ultra vires* doctrine—that is, a conclusion that the trustees exceeded their authority by continuing to compensate RPM without subtracting the commissions from the regular advisory fees. The only people liable under the *ultra vires* doctrine are the trustees. Under Wisc.Stat. § 180.06(2) people who deal with a trust or corporation are entitled to keep what they receive; liability falls on those who should not have authorized the payment. Thus the conclusion that George Weinstein—the only trustee of WREIT among the defendants—was liable for wrongful payment also established the outer limits of liability.

This left the defendants' request for attorneys' fees. These, the district court concluded, were required by § 7.4(c) of the declaration of trust, which states that "[t]o the extent that a Trustee, officer, employee or agent has been successful on the merits or otherwise in defense of any action [concerning his dealings with the trust] he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith." Stanley Weinstein, RPM, and Weinstein Associates had been successful across the board, the court held, and were entitled to fees.

George Weinstein had lost on the claim under § 4.5, although he had prevailed on

claims involving the securities laws and common law fiduciary duties. The court found George entitled to fees under § 7.4(b) of the declaration of trust, which states that WREIT shall indemnify a party who "acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Trust". There is an exception for a claim "as to which such person shall have been adjudged to be liable for negligence or misconduct in the performance of his duty to the Trust", and the court thought that George had been held liable for misconduct. All the same, there is an exception to this exception. There shall be indemnification for expenses if "the court in which the action was brought . . . shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper." George had acted in subjective good faith given the opinion of counsel, the court concluded, and he had negotiated for a package of compensation in good faith at arms' length. The package ran afoul of § 4.5, but the court thought that George's obligation (as a trustee) to pay to WREIT the excess compensation did not require him to bear the cost of litigation.

WREIT challenges almost all of the district court's reasoning. Its first argument is that the court should have found Stanley Weinstein, RPM, and Weinstein Associates liable along with George Weinstein. When we asked at oral argument what difference this made—given the district court's conclusion that the net payments run in favor of the defendants and the uncontested representation that George is solvent and willing to pay the entire judgment even if we alter the direction of the net payments—counsel for WREIT replied that the disposition of the stock and the liability for fees turned on the question. The record does not show who holds the stock; if Stanley does, it may be reached only if Stanley is liable. Similarly, if Stanley, RPM, and Weinstein Associates are liable, they cannot recover attorneys' fees under § 7.4(c)

of the declaration of trust. We conclude below, however, that the district court correctly held that WREIT is not entitled to the stock no matter who holds it, and that the court was entitled to award fees under § 7.4(b). It is therefore irrelevant whether Stanley, RPM, and Weinstein Associates may be held liable, and we shall consider the matter no further.

## II

WREIT accepts the district court's conclusions about the amount and timing of the Manager's advisory compensation and commissions. It contends, however, that the district court should not have offset the compensation and commissions by contract year, should not have reduced the compensation by the amount of the credits, should not have required WREIT to make good the $30,000 in withheld commissions, and should have ordered the defendants to turn over the 27,000 shares of stock. We consider these in turn.

1. Although § 4.5 requires WREIT to reduce the Manager's advisory compensation by the amount of any commissions, it does not specify the period over which the offsets should occur. No statute of Wisconsin supplies an accounting period for a problem of this sort. The district court therefore had to pick an accounting period. WREIT urged the entire 1977–80 period, or at least calendar years, while the Manager urged the contract years. The district court picked the contract years.

This was a permissible interpolation. The contract is incomplete, and when supplying terms of an effective but incomplete contract a court properly picks those for which the parties probably would have bargained, had they anticipated the problem. A year is a common accounting period, for taxes and financial reporting as well as contracts. Accounting years frequently follow contractual relations rather than the calendar.

Section 4.5 does not control the Manager's compensation; the advisory compensation could have been $500,000 per year

without offending § 4.5. That section of the declaration of trust governs only the way in which two components of compensation affect each other. If the parties had known of the legal effects of § 4.5, at the end of each contract year they could have negotiated a new salary that (after subtraction of commissions) would have produced the net compensation on which the Manager and WREIT settled. By changing the level of salary, the parties could have bargained around the consequences of § 4.5. This contracting would have occurred every contract year, which makes the contract year the appropriate accounting period, just as the district court held.

The district court gave an additional reason, which adds further support to this conclusion. Suppose the parties could not counteract the effect of § 4.5 by increasing the salary in a new contract year. Then if commissions in year one could reduce the compensation in year two, the Manager would have quit at the end of year one. Why should the Manager work for WREIT in year two if its compensation would be withheld to offset the commissions in year one? Or the reverse—why work for WREIT if § 4.5 means not only that in any given year the Manager may take the higher of salary or commissions (but not both) but also that the Manager must pay back compensation from an earlier year? Both WREIT and the Manager wanted a package of compensation in any given year that would elicit the Manager's dedicated service. If the compensation in one year could evaporate because of commissions in earlier or later years, the Manager would either leave WREIT's employ or perform below par. The district court was entitled to conclude that neither party wanted this, and therefore that the accounting period should be the contract year. As it turns out, this works to WREIT's advantage.

■ 2. The district court determined three figures for each contract year: the Manager's advisory compensation, the fee credits the Manager returned to WREIT, and the Manager's commissions. The court subtracted the fee credits from the advisory compensation, producing an adjusted compensation. Only 1979 and 1980 had positive adjusted advisory compensation. Because the commissions exceeded the adjusted compensation in each of 1979 and 1980, the court ordered George Weinstein, in his role as trustee of WREIT, to reimburse WREIT for this sum of about $56,000. (Had the district court adopted WREIT's argument that 1977–80 is a single accounting period, the $329,500 fee credit in 1977 would have wiped out all later advisory compensation. WREIT is lucky it lost this point.)

WREIT's principal objection to this procedure is the use of the credits to reduce the advisory compensation. The credits, WREIT insists (and defendants do not deny), largely came from tax benefits arranged through the Manager. The Manager's contract required it to pay the credits to WREIT, and it did. To use these credits to reduce the Manager's advisory compensation, WREIT says, is slight of hand; the credits have nothing to do with the compensation, which alone is the subject of § 4.5. The credits were WREIT's all along, and to use them to reduce the advisory compensation is double counting.

The district court justified its treatment of the fee credits, as it justified the use of the contract year, by reference to the bargain the parties would have struck had they known of the legal meaning of § 4.5. They were under a misapprehension; they thought that the Manager would keep the commissions. But they were not under a misapprehension about the nature of the financial arrangement they wanted. The Manager had other opportunities; the district court found that had the Manager been paid less than WREIT agreed to pay, the Weinsteins would have left and worked elsewhere. The district court thought that reducing the advisory commissions by the fee credits would bring the parties closer to the deal they tried to negotiate.

To see the court's point, suppose the Manager insisted on $150,000 a year as compensation for investment advice. (We ignore the Manager's services as property

manager, just as the district court ignored the credits the Manager paid to WREIT for income from property management.) The parties had three sources of money they could use to give the Manager this income: salary, commissions, and the fees the Manager earned from creating tax benefits. Suppose the Manager earned $100,000 in fees. One way to give the Manager a net income of $150,000 would be to pay a salary of $100,000 and commissions of $50,000, while the Manager returned the fees to WREIT. Another way would be to pay a salary of $100,000 and let the Manager keep half of the fees. After the application of § 4.5, the first method would leave the Manager with $100,000—the salary would be reduced by $50,000 on account of the commissions. The second method would be unaffected by § 4.5, because the Manager would not have received commissions. There is a third method: pay a compensation of $100,000, give the manager $50,000 in commissions, and provide by contract for the return of all fees as credits against the compensation. This reduction of the salary to zero would leave the Manager with $150,000 at the end of the year, exactly what the parties wanted—more to the point, exactly what they could have achieved had they anticipated the eventual construction of § 4.5.

The district court treated the allocation of the fee credits like the selection of the accounting period—as a problem of supplying missing terms in a contract. WREIT replies that there are no missing terms. The Manager's contract required it to pay the credits to WREIT. It follows, WREIT insists, that the district court is wrong. Not so. The problem is not one of missing terms; it is instead one of restitution. The district court effectively set aside the compensation contract on account of the mutual mistake about the meaning of § 4.5 and then substituted a remedy from the law of restitution.

The Manager supplied two things of value to WREIT: the Manager's services and the fee credits. WREIT promised to supply two things in exchange: the advisory compensation and the commissions. The

Manager delivered services and credits as promised, but under § 4.5 WREIT could not perform as promised. The law of restitution permits a person who paid money under a mistaken belief that there would be reciprocal performance to get the money back—and here the money paid under a mistaken belief was the fee credits. See *Restatement of Restitution* §§ 9, 16 (payment under an erroneous belief that payment complies with a contract not subject to avoidance is a ground of restitution); see also *Guardianship of Kordecki*, 95 Wis.2d 275, 290 N.W.2d 693 (1980) (benefits paid as a result of mistakes are subject to restitution); *McKinnon v. Vollmar*, 75 Wisc. 82, 43 N.W. 800 (1889). See also *Restatement (Second) of Restitution* §§ 1, 5 & comment a, 6(1) (Tent. Draft No. 1, 1983). Reducing the advisory compensation by the amount of the fee credits is the same thing as awarding restitution or reformation of the contract (which would amount to the same thing), and so we think the district judge was entitled to do what he did.

The use of the concept of restitution here may seem odd. RPM received all the money for which it contracted, and because its compensation was not reduced under § 4.5 the district judge did not determine whether WREIT owed restitution to RPM. George Weinstein was held liable in his role as trustee of WREIT, not as an officer of RPM. George did not furnish the credits to WREIT. The parties have argued this case, however, as if it were a battle between RPM and the trust. The district court, with the parties' implicit assent, has computed the net amount RPM would owe to WREIT if it were liable, and then the court has required George to make good the shortfall. RPM could reduce its total liability by invoking principles of restitution, and therefore George gets the benefits of this reduction.

■ 3. This conclusion also disposes of WREIT's argument that it need not pay to the Manager the $30,000 in commissions it caused to be withheld. These commissions

apparently were earned during contract years 1979 and 1980. The district court has ordered George Weinstein to pay WREIT every penny of adjusted advisory compensation the Manager received in 1979 and 1980. Section 4.5 does not make commissions improper; it simply requires a corresponding reduction in salary. That salary has been reduced to zero, and the Manager is entitled to the full commissions for which it contracted. The district court properly held WREIT liable for tortiously interfering with the Manager's contracts for the disputed $30,000 of commissions.

■ 4. WREIT is not satisfied with receiving a return of the advisory compensation. It wants the 27,000 shares of stock too. WREIT's trustees agreed to pay the Manager $91,000 in connection with some property WREIT acquired. The Manager agreed to accept the shares in lieu of the $91,000. The shares were worth $91,000 when issued, but they have appreciated since, and WREIT not only wants to recoup the appreciated value but also to avoid paying dividends that have accrued since 1980.

To the extent WREIT's position is based on the contention that the payment of commissions was itself wrongful, it fails because § 4.5 does not ban commissions. It requires a reduction in the salary, which the district court has accomplished. To the extent WREIT argues that because it paid the Manager in stock it must be paid back in stock, it misunderstands the nature of stock.

WREIT's stock is listed in the National Association of Securities Dealers Automated Quotation system (NASDAQ) and is traded regularly. A traded stock is the next best thing to cash. WREIT could have given the Manager $91,000, which it might have invested in WREIT's stock (if necessary, buying the stock directly from WREIT). Whether it did this or gave the Manager the stock in lieu of cash, WREIT paid $91,000, and the Manager then had to decide whether to take the risk of holding the stock. Firms often want supervisors to hold their stock, because then the supervi-

sors and the other investors rejoice or weep together. This makes managers better agents of investors. The deal in this case gave the Manager an interest in common with other investors, and there is nothing suspect about such an arrangement.

The Manager held the stock, and it rose. Had the stock fallen, the Manager would have been the poorer. If the stock had fallen from $91,000 to $20,000, we doubt that WREIT would be anxious to receive the stock in exchange for a debt of $91,000 (or even $56,000) just because it once was worth more. If the Manager had sold the stock in 1981, we do not suppose WREIT would want 27,000 shares of stock or the price the Manager got in 1981. What WREIT paid the manager was $91,000. Since then the Manager's holdings have been indistinguishable from those of any other investor. All have converted money to stock; all seek the gain of investment in exchange for the use of the money and the risk of loss.

The principle that investment gains must be separated from the initial acquisition holds even when a person comes by stock wrongfully. Suppose the Manager, with material inside information about WREIT, had purchased shares on the open market. Under prevailing law this inside trading would have been wrongful. Yet the Manager would not have been disabled from buying stock altogether. It could, for example, have purchased the stock immediately after the material news had been revealed. The remedy for inside trading is therefore the amount of the "bargain," the difference between the price the insider pays for the stock and the price the stock sells for soon after the material news has emerged. See *SEC v. MacDonald*, 699 F.2d 47 (1st Cir.1983) (en banc); *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 168–73 (2d Cir.1980). Once the news is out, anyone, including the insider, may buy and hold the stock lawfully, and the gains and losses during this subsequent period belong to the holder of the stock. So it is here. Even if the Manager should not have received the 27,000 shares from

WREIT, anyone (including the Manager) could have bought 27,000 shares of WREIT stock on the open market for $91,000. By not selling the stock it received, the Manager made an investment decision. It stood to suffer the loss of this decision and is entitled to the gain.

### III

■ After ordering George Weinstein to pay $56,057 plus interest to WREIT, the court ordered WREIT to pay the defendants more than $220,000 to cover their costs and attorneys' fees. WREIT does not challenge the reasonableness of these fees, which helped the Manager defend against many claims in addition to the one on which WREIT prevailed.

The only source of authority to award fees we need consider is § 7.4(b) of the declaration of trust, which allows a court to direct WREIT to indemnify even officers who have been held liable to the trust if "in view of all of the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper." This provision was copied from Wisc.Stat. § 180.05, which was copied from § 5 of the 1969 version of the American Bar Association's *Model Business Corporation Act.* The language survived in materially identical form as § 8.54(2) of the 1984 revision of the Model Act. The annotations to the Model Act state that no published opinion has construed this language, see 2 *Model Business Corporation Act Annotated* 1127 (3d ed. 1985).

The district court awarded attorneys' fees under § 7.4(b) because it believed "the equities of this case reside with the defendants. This is not a case involving flagrant abuse of managerial powers.... George Weinstein did not dominate the Trust; his compensation was negotiated at arm's length and in good faith. Neither party was concerned with the form in which RPM was paid, but it was understood that unless Weinstein received a certain level of compensation his services would be lost to the Trust." The district court relied in another

portion of its decision on the opinion of counsel, who before WREIT and the Manager started using commissions as a form of compensation, told them that this would not require a reduction under § 4.5. The district judge's discussion of § 7.4(b), combined with several other expressions in his opinion, leaves us with the sense that he thought WREIT had used § 4.5 to upset expectations WREIT had created. It had a legal right to do this, as we held on the first appeal, but a firm is not compelled to do everything it has a legal right to do, and the district judge thought that the maximum cost to the Manager of WREIT's exercise of its privilege should be the excess compensation, not the compensation plus the legal fees.

Neither party has discussed the standard of review of the district court's decision. In earlier cases involving fees we have looked for abuse of discretion. E.g., *In re TCI, Ltd.,* 769 F.2d 441, 448 (7th Cir.1985). Abuse of discretion is a phrase with many shadings, however, and we should not grapple with the nuances when the parties did not. Whatever the verbal formulation, review should be highly deferential. Section 7.4(b) calls on "the court in which such action or suit was brought" to make a decision whether a person is "fairly and reasonably" entitled to recover the expenses of the litigation. The parties to the declaration of trust bargained for an equitable judgment rather than a legal one. A firm need not allow indemnification to the maximum legally permitted; the statute that authorizes provisions such as § 7.4(b) also allows firms to negate this power. Instead of withdrawing the power or laying down rules and standards by which the court was to decide, the parties agreed to accept a decision based on "all the circumstances of the case".

No particular facts are dispositive. It is therefore hard to see how an appellate court could say that any decision is "wrong," because no fact either establishes or negates an entitlement to compensation. We can review the facts, as the district court did, but we do not have the same

grasp of the entire litigation as the district judge did; more important, it is not our decision for which the declaration of trust asks. "The scope of the district court's discretion is greatest when there is no strictly legal rule of decision, when there is no standard against which to compare the district court's decision." *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 831 (7th Cir.1985); see also *Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 937–40 (7th Cir.1984) (concurring opinion). When there is no "right answer" an appellate court may review to ensure that the district court considered the pertinent things and did not rely on impermissible things, but the exercise of judgment belongs to the district judge.

There are no criteria in § 7.4(b). The declaration of trust does not identify facts to consider or avoid considering. Any judgment under § 7.4(b) must weigh incommensurables—the value of enforcing provisions such as § 4.5, the need to impose effective sanctions on trustees such as George Weinstein who violate the rules of the trust they administer, the need to assure would-be managers of WREIT and other trusts that good faith mistakes in the interpretation of legal documents will not lead to personal expenses far exceeding the cost to the trust of the error. Dealing with these incommensurables requires great sensitivity, but it does not produce legal error. We must ensure that a judge *exercises* judgment, but that is about as far as an appellate court should venture.

The district judge exercised careful judgment in deciding to award attorneys' fees and costs under § 7.4(b). WREIT attacks the court's decision by saying that it undermines deterrence of wrongdoing, but this is an objection to any compensation of a losing party, yet § 7.4(b) authorizes the payment of expenses of losing parties. WREIT also contends that an award of indemnification makes a farce of the case— the firm sues the manager who pays the firm, which then must hand the money back to the manager. It is settled, WREIT insists, that a firm may not indemnify an officer who has been held liable to the firm.

See Joseph Bishop, *Law of Corporate Officers and Directors* ¶ 6.03[7] (1981). If the firm must repay to the officer the money it has just collected, there will be no deterrence at all, and officers may commit wrongs at will. This is off the mark because § 7.4(b) does not authorize indemnification on account of the award of damages. The district court held George Weinstein liable to the tune of $56,000, and George is the poorer by that amount. Section 7.4(b) allows indemnification for expenses only; George pays $56,000 to WREIT rather than $56,000 to WREIT and $220,000 to his lawyers, as he would have to do if we reversed. George is out of pocket $56,000 plus interest at the end of this case—just exactly the amount of the excess compensation the Manager received.

Unless attorneys' fees are part of the deterrent in cases involving managers, the award of fees does not undercut the court's ability to induce compliance with trust instruments in the future. The function of a provision such as § 7.4(b), however, is to reduce the threat of deterrence via the cost of litigation. The firm may want its managers to act without fear that the costs of the legal process will be the punishment for mistakes. Managers often commit a great deal of their time and their wealth to a single corporation. If anything goes wrong they may be ruined far more easily than the investors. Investors may own small stakes in many firms; WREIT is not the only real estate investment trust, and most investors in WREIT must own stocks and bonds in other kinds of ventures as well as other investment trusts. These investors can afford to take risks because if one investment does poorly another will pay off; diversified investments reduce the effective risk to which investors are exposed and can effectively eliminate firm-specific risks. Managers will not be equally diversified; as we observed, managers often own large blocs of stock of the firms they run, the better to align their interests with those of other investors. The firms, with their diversified investors, are better able to bear the risk of costly litigation

than are the managers. See Reinier H. Kraakman, *Corporate Liability Strategies and the Costs of Legal Controls,* 93 Yale L.J. 857 (1984). Managers exposed to the high costs of litigation whenever they misconstrue legal documents are apt to be timid managers, and firms may elect—WREIT did elect through § 7.4(b)—to reduce managers' exposure.

Section 4.5 is clear, we held in 1983, but even clear documents may be misunderstood. The lawyer who advised WREIT and the Manager about the meaning of § 4.5 got it wrong. The district court got it wrong in 1982. The panel of our court that reversed in 1983 was divided. Two of the four judges who have construed § 4.5 therefore agreed with the legal opinion WREIT obtained before the new trustees took over. The division of opinion suggests that there was plausible support for the incorrect view. *Indianapolis Colts v. Mayor and City Council of Baltimore,* 775 F.2d 177, 181 (7th Cir.1985). The earlier misconstruction of § 4.5 did not enrich the Manager at the expense of the investors; as the district court concluded, had WREIT and the Manager been aware in 1977 of the construction we eventually gave to § 4.5, they would have revised the Manager's compensation package to produce the same net payment, though with different components. So although WREIT is entitled to $56,000 as a result of its and the Manager's mistaken construction of § 4.5, the district judge was entitled to hold the defendants' out of pocket loss to $56,000. He did not abuse his discretion.

One argument remains. Some of the attorneys' fees were incurred in this court in 1983. The defendants lost in this court, and we awarded costs to WREIT. The Trust argues that this award of costs precludes the district court from shifting the costs and fees back to it as part of the final judgment. Yet § 7.4(b) speaks of the expenses of the suit, not of little parts of the suit. Any litigant may have some small victories and some small losses along the way; § 7.4(b) allows compensation even of parties who lost altogether. Awards of fees usually abide the outcome of the case.

See *Hanrahan v. Hampton,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) (the "prevailing party" for the purposes of fees under 42 U.S.C. § 1988 is the winner of the litigation, and the winner of an interlocutory appeal gets fees only if he also prevails at the end of the case). The appeal in 1983 was but a step toward the conclusion at which this litigation has arrived. Section 7.4(b) allows a court to shift the entire expenses of litigation to the firm, and the court need not distinguish the expenses of earlier appeals from the expenses incurred in the district court.

AFFIRMED.